# FOURTH DISTRICT, NOVEMBER, 1897.

### L. S. BERG v. SAN ANTONIO STREET RAILWAY COMPANY.

Delivered November 3, 1897.

**1. Corporation—Increase of Stock—Statutory Provision.**

Article 576, Revised Statutes of 1879, provides that a corporation may increase its capital stock to any amount "not exceeding double the amount of its authorized capital," and where a corporation increases its capital stock more than double its originally authorized capital, the increase is invalid, whether such increase is attempted to be made at one or more times. Following Kampman v. Tarver, 87 Texas, 497.

**2. Same—Contract With Agent for Sale of Bonds—Presumption—Commissions Due.**

Where an agent who is employed to sell the bonds of a corporation is ignorant of their invalidity, he has the right to presume that they are valid; and if he find a purchaser able and willing to buy at a price and on terms satisfactory to the owner of the bonds, and the sale fails because of their invalidity, the agent is entitled to his commissions, though by his contract he is to be paid only if the sale is effected, and the money realized therefrom by the seller.

**3. Same—Agent's Right to Commission Not Defeated.**

Where the agent of a corporation employed by it to sell its bonds has no knowledge of their invalidity, and finds a purchaser, but the sale is not completed because of the invalidity of the bonds, the agent does not lose his right to his commissions, because the corporation, after the time for performing the contract of sale has expired, procures the defect to be cured within a reasonable time, with the knowledge and consent of the agent and proposed purchaser, and the latter still refuses to take and pay for the bonds.

**4. Contract for Sale of Bonds—Time of the Essence.**

Where a contract for the sale of corporate bonds definitely specified a time for its completion by the delivery of the bonds, time was of the essence of the contract, and the proposed purchasers who had, before that date, refused to take the bonds because they were invalid, were not bound to take valid bonds after the time specified.

ON MOTION FOR REHEARING.

**5. Same—Compensation Not Due Agent.**

Where an agent employed to sell corporate bonds, at the time he contracts or performs the work for which he asks compensation, knows of the legal defect in the bonds which ultimately defeats his effort to sell, he is not entitled to recover.

**6. Same—Agent May Contract to Make Satisfactory Title.**

That an agent, in negotiating a sale of corporate bonds, contracted with the purchaser providing that the title should be satisfactory to the purchaser's attorneys, is not a recognition of a defect in his principal's title which would defeat a recovery for his commission, where the sale failed on account of such defect.

APPEAL from Bexar. Tried below before Hon. J. L. CAMP.

*Wm. Aubrey* and *Upson, Bergstrom & Newton,* for appellant.—1. The court erred in charging the jury that if they found that plaintiff and defendant entered into an agreement for the sale of said bonds, by the

terms of which plaintiff was to be paid a commission only in case the sale of said bonds was effected and the money realized therefrom by defendant, they would find for defendant herein, notwithstanding the invalidity of said bonds was the sole cause of the failure to consummate said sale. Railway v. Robinson, 73 Texas, 277.

2. One who is employed to contract for the sale of property designated by his employer earns and is entitled to receive the compensation fixed by the terms of his employment when he procures to be made between his employer and another a contract for such sale. Conkling v. Krakauer, 70 Texas, 739; Graves v. Bains, 78 Texas, 92; Bowser v. Field, 17 S. W. Rep., 45; Hoefling v. Hambleton, 19 S. W. Rep., 689; Moody v. Thornton, 24 S. W. Rep., 331; Byrd v. Frost, 29 S. W. Rep., 46; Orynski v. Menger, 39 S. W. Rep., 388; 1 Warv. on Vend., sec. 26. p. 237; Mech. on Agency, sec. 966, p. 794.

3. The invalidity of its bonds did not excuse the failure of performance by defendant within the time fixed by the contract. Conkling v. Krakauer, 70 Texas, 739; Kock v. Emmerling, 22 How., 69; Gonzales v. Broad, 57 Cal., 224; 2 Am. and Eng. Encyc. of Law, 581, note 2.

*Houston Bros.*, for appellee.—The court will enforce a contract as they find it entered into by the parties. A recovery can not be secured on a contract for commission providing payment thereof only out of the cash proceeds of such sale when the sale never was effected. The parties must stand by the agreement as they undertook it, and "show a compliance with the very terms of the contract." We respectfully submit that the case of Pryor v. Jolly, 40 Southwestern Reporter, 959 (Texas Supreme Court), supports this proposition and fairly and fully answers every contention of the appellant. This is such a recent declaration of the law applicable to this case that we deem it unnecessary to cite other authorities.

NEILL, Associate Justice.—This suit was brought by appellant against appellee to recover $9000 and interest thereon at the rate of 6 per cent per annum from September 22, 1892, alleged commissions for effecting the contract of sale of appellee's bonds to N. W. Harris & Co. under the contract shown in our statement of the facts.

The appellee in his answer admitted the employment of appellant and the making of the contract through his agency with Harris & Co., but averred that Harris & Co. never intended to perform the contract for the purchase of the bonds, and that they made said contract to appellee with the expectation that they would be able to negotiate the bonds at a profit, and with this object in view they delayed taking the bonds, though the appellee at all times insisted that they should do so. That finally, on July 25, 1895, they declined taking the bonds at all. Appellee also alleged that it was always willing and anxious to deliver the bonds under the contract with Harris & Co., and had complied with every objection and requirement on their part as to all formalities necessary for

issuance and delivery of the bonds, and would have long since issued and delivered same if Harris & Co. had complied with their part of the contract and had not repeatedly informed appellee that they were not prepared to receive and pay for the same; that appellee had not been able to compel Harris & Co. to perform their contract to take the bonds; that they were nonresidents, and had no property in this State within the knowledge of appellee, and that it was powerless to enforce the contract with Harris & Co.

The appellant, by supplemental petition in reply to the answer, alleged that appellee was not able and never did offer to deliver to Harris & Co., at any time it was bound to do, its legal bonds, but sought to deliver them its illegal bonds, issued in excess of its charter provisions, and which were null and void, and which, on account of said illegality and invalidity, Harris & Co. refused to receive as a compliance by appellee with its said agreement to deliver said bonds.

The case was tried before a jury and a verdict rendered and judgment entered for the appellee, from which judgment this appeal is prosecuted.

The uncontroverted facts are:

1.  The San Antonio Street Railway Company, by its president, W. H. Weiss, executed to L. S. Berg the following contract in writing:

"SAN ANTONIO, TEXAS; 8, 19, '92.

"*Mr. L. S. Berg, City:*

"DEAR SIR—You are hereby authorized and empowered to contract for the sale, for our account, of $450,000 first mortgage bonds of the San Antonio Street Railway Company, at a price of not less than 90 cents net to this company, and accrued interest. Said bonds to be delivered in New York or Chicago. Any sum realized over the said 90 cents net and accrued interest will be paid to you as commission for effecting said sale. Said commission to be paid you in cash as received from the parties to whom you may sell said bonds.

"Yours very truly,

"SAN ANTONIO STREET RAILWAY CO.,
"By W. H. WEISS, Pres."

2.  In pursuance of said contract, appellant, as agent for the appellee, negotiated with N. H. Harris & Co. the following contract in writing:

"Memorandum of Agreement. — This memorandum of agreement, made and entered into this seventeenth day of September, 1892, by and between the San Antonio Street Railway Company, a corporation of San Antonio, Texas, by Louis S. Berg, its duly authorized agent, first party, and N. W. Harris & Co., of Chicago, Illinois, second party;

"Witnesseth: That whereas the said first party is desirous of negotiating its bonds for the purpose of retiring its present outstanding bonded debt, and liquidating its present floating indebtedness, and pro-

viding for the future extension of its street railway lines; and proposes to issue its first mortgage bonds on its street railway plant, in and near the city of San Antonio, Texas, in the amount of one million dollars;

"And whereas the said second party desires to contract for the purchase of said bonds;

"Now therefore, said first party, in consideration of the agreements hereinafter contained on the part of the said second party, agrees that it will issue its first mortgage bonds in the aggregate amount of $1,000,-000, to be dated November 1, 1892, in denominations of $1000 each, bearing interest payable semi-annually, at the rate of 6 per cent per annum, both principal and interest payable in gold coin of the present standard of weight and fineness, in New York or Chicago, at the option of the holders of the bonds; said bonds to mature in from five to thirty years, in installments to be hereafter agreed upon.

"And that it will secure the payment of said bonds by the execution, acknowledgment, and delivery of a deed of trust to such trustee as may be selected by said second party, to be executed by said first party, upon the real estate, franchises, rights, incomes, profits, machinery, buildings, fixtures, and all property, real or personal, of whatsoever description, now owned or which may hereafter be acquired by the said first party, which said trust deed shall be a first lien on all of said property.

"The trust deed shall provide for the immediate issue of $450,000 of bonds, the proceeds of which it is agreed shall be applied:

"First, to the retirement of the first mortgage bonds of said first party, which are outstanding at the date of this contract, but which it is agreed shall be canceled and released contemporaneously with the delivery of the trust deed securing the issue of bonds herein contracted for; and

"Second, the retirement of the outstanding floating debt of said first party.

"Said trust deed shall provide no bonds in excess of $450,000 shall be certified or issued, except for the purpose of reimbursing said first party for 85 per cent of the actual cash cost to said first party of extensions of its present lines of railway track, made or acquired by it, including paving and overhead construction connected with such extensions so made or required, and not then until such time as the net earnings of said first party, derived from said street railway, over and above operating expenses, maintenance, and pro rata taxes and insurance, for twelve months next preceding any application to said trustee for the issue of any portion of said last mentioned bonds, shall be equal to the interest at the rate of 12 per cent per annum upon the entire amount of all bonds previously certified to by said trustee and then outstanding, together with the bonds proposed to be issued, and then only upon the order of the president and secretary of said first party, which order shall be accompanied by their certificate, showing the actual cost to the railway company of such extensions of its present lines of railway track, made or acquired, actually made and paid for, including paving and overhead construction connected with such extensions, such cost to be shown in

detail, accompanied by the proper vouchers therefor. And said first party shall also show to said trustee legal authority for making such extensions.

"Said certificate shall also state the amount of receipts and expenses in detail of the said street railway for the twelve months next preceding the date of such extensions, and there shall not be included in the statement of receipts as an item of income, or otherwise, any moneys received as and for a subsidy, or in the nature of a subsidy, paid or promised to said first party as an inducement to provide such extensions, or for any other purpose whatever.

"It is understood and agreed that the said first party shall be under no obligations to issue any part of the said $450,000 of bonds held in escrow under the terms of the trust deed for the purpose of providing for future extensions.

"In consideration of the above agreements, and those hereinafter.contained, the said first party hereby agrees to sell, and the said second party agrees to purchase, the said $450,000 of bonds herein provided, to be immediately issued, under the provisions of the trust deed, at the price of 92 cents on the dollar and accrued interest; and it is agreed that said bonds shall be delivered to said second party in New York or Chicago, at the option of said second party, in installments as follows: $218,000 of said bonds, as soon as the papers evidencing the legality of the said issue have been approved by the attorneys of said second party, the proceeds of which, it is agreed, shall be at once applied to the redemption of the present outstanding mortgage bonds of said first party; $100,000 of said bonds shall be delivered and paid for on December 1, 1892; the remaining $132,000 of said bonds shall be delivered on March 1, 1893, or in blocks of $25,000 or upwards, at any time prior thereto, at the option of the said second party.

"Said first party also hereby agrees to grant, and by these presents does grant, an option to said second party to purchase all the bonds remaining in escrow, over and above the said $450,000 of bonds, as they shall be issued at the same price as above stipulated, viz., 92 cents on the dollar and accrued interest.

"Said second party agreeing in return to exercise its said option, to purchase or not to purchase, within ten days from the receipt of notice from the trustee that bonds can properly be certified and withdrawn from escrow.

"And the said first party hereby agrees to give the said trustee and said second party thirty days notice in writing of its intention at any time to ask for the withdrawal of bonds from escrow.

"The said railway company shall furnish, prior to the delivery of said bonds herein agreed to be purchased, a sworn statement, signed by its president and secretary, setting forth in detail the actual amount in cash invested in the construction and equipment of said street railway plant; and shall also furnish a sworn transcript from the books of said com-

pany, showing the passenger receipts and operating expenses for the past five years.

"Said first party agrees to deliver to said second party one share of the fully paid up capital stock of said first party.

"It is hereby agreed that the bonds and trust deed shall be prepared by said second party, of the form usually used by them, and that the actual expense of lithographing the bonds shall be borne by the first party.

"Said first party agrees to furnish full legal papers, including abstracts of title, certified copies of franchises, and such other papers as may be required by the attorneys of said second party, prior to the delivery of said bonds, showing satisfactorily to said attorneys the legality of said issue of bonds and the same to be a first and only lien on the entire street railway plant, including all property of whatsoever nature appurtenant thereto, subject only to the lien of the outstanding mortgage indebtedness of $200,000, which it is herein above agreed shall be retired contemporaneously with the delivery of said first installment of bonds.

"It is hereby understood and agreed between the parties hereto, that the purchase of said bonds of said first party by said second party is subject to an examination by said second party of the franchises, books and papers, plant and security, of said first party, and second party hereby agrees to send its expert representative to make such examination at San Antonio as soon as possible—not later than October 17, 1892. It being stated and agreed herein, as a condition of said purchase, that said report shall be satisfactory to said second party.

"Said first party agrees to bear $400 of the expense of sending such expert representative to San Antonio, it being agreed that in the event the purchase herein provided for is completed, the said amount shall be refunded by said second party.

"It is agreed that this memorandum of agreement shall be ratified by the board of directors of the said San Antonio Street Railway Company, and that until such ratification the same is not binding on said second party.

"In witness whereof, the said parties hereto have caused these presents to be executed in duplicate, the day and year first above mentioned.
(Signed)  "N. W. Harris & Co.,
"Forbes.

"Interlineations made prior to signature.
(Signed)  "N. W. Harris & Co.,
"Forbes."

3. The contract first inserted in this opinion was in fact reduced to writing and executed subsequent to execution of the one made with N. W. Harris & Co., but is expressive of an oral contract that existed between appellee and appellant at the time the latter contract was made.

The contract with Harris & Co. was negotiated by appellant with some minor modifications, which were not objected to by the last named

parties, but ratified by the board of directors of appellee company on September 22, 1892.

4. An examination of appellee's property upon which the bonds were issued and secured was made by an agent of Harris & Co. shortly after the contract was executed, and from the examination they were satisfied with the sufficiency of the security. The appellee furnished Harris & Co. all papers to enable their attorney to pass upon the legality of the issuance of the bonds. Upon investigation by the attorney, he objected to the legality of the bonds upon the ground that under the articles of corporation, and in view of the manner in which appellee's stock was increased, it was not authorized to issue bonds in the amount contracted for.

5. The original capital stock of appellee company was $200,000; this was subsequently increased to $400,000, afterwards to $800,000, and finally to $1,000,000. This increase of stock was effected by amendments to the charter of the company filed with the Secretary of State prior to the execution of the contract with Harris & Co. On account of the manner in which the capital stock was increased, the legality of the proposed issue of bonds was never satisfactory to the attorney of Harris & Co., and for that reason they failed and refused to take the bonds and pay the price therefor, or any part of it agreed upon in their contract. But the appellee was ready and willing at all times after its execution to issue and deliver to Harris & Co. the bonds in the amount specified and in accordance with the terms and provisions of the contract, and at the instance of Harris & Co. was instrumental in procuring the passage by the Legislature of the Act of March 1, 1897, validating bonds in cases where the amount of capital stock of any corporation had theretofore been increased by more than one increase thereof to an amount in excess of double the amount of original capital, where such an increase had been made with the sanction of the Secretary of State under his construction of the law. Sayles' Civ. Stats. of 1897, art. 652a. After this act was passed, Harris & Co. failed and refused to take the bonds on account of the general stringency in the money market, though they were financially able at that time as well as ever since the execution of the contract to take and pay the price for the bonds agreed upon.

The question from the undisputed facts is, was the objection urged to the bonds by the attorney of Harris & Co. valid, or in other words, was the issuance of the bonds illegal? If they were legal, the appellant would have no cause for action, because the contract he made for the company left the determination of their legality to the attorney of the parties to whom the contract of sale was negotiated, and he having pronounced them invalid, and the sale not being consummated on that account, the fund from which appellant's commission was to be realized would never have come into the hands of the appellee. But the appellant in the absence of knowledge to the contrary had the right to assume that the bonds he was authorized by the appellee to negotiate were valid, and if they were not valid, it was not his fault, but appellee was solely

responsible for it, and appellant, having under the contract negotiated the sale upon which he was entitled to the commission stipulated, would be entitled to recover his compensation, notwithstanding the fact that the sale was never consummated.

Article 576, Revised Statutes of 1879, provides: "Any corporation may increase its capital stock to any amount not exceeding double the amount of its authorized capital, by a vote of the stockholders, in conformity with the by-laws thereof; and if a majority of the stockholders shall vote for the increase of the stock, the same may be increased by the board of directors, trustees, or other business managers of such corporation; and upon such increase of stock being made in accordance with the by-laws, the date and amount shall be certified to the Secretary of State by the directors or trustees, and from the time such certificate is filed, the increase in stock shall become a part of the capital stock thereof. Such certificate shall be filed and recorded in the same manner as the charter."

And the next succeeding article provides as follows: "Corporations shall have power to borrow money on the credit of the corporation, not exceeding its authorized capital stock, and may execute bonds or promissory notes therefor, and may pledge the property and income of the corporation."

These articles were in force at the time of the increase of appellee's capital stock, and when the contract negotiated by appellant with Harris & Co. was entered into.

By Act of the Twenty-third Legislature, article 576 was amended by inserting the words "at any one time" between the words "exceeding" and "double" in the second line of the original article, and by adding to the last sentence of the article the proviso, "that no stock shall be issued except for money paid, labor done, or property actually received." Section 2 of the same act also provides, "That in all cases where the amount of the capital stock of any corporation has heretofore been increased by more than one increase thereof, to an amount in excess of double the amount of the original capital, and such increase has been made with the sanction of the Secretary of State, under his construction of the law, such increase shall be, and the same is hereby, validated and declared legal." This act was not passed until the expiration of the time for the performance of the contract between appellee and Harris & Co. for the sale of the bonds. They, however, serve to show the construction placed by the Legislature upon article 576 as originally enacted; and its construction was that a corporation could not, under the act, increase its stock beyond double the amount of its original capital stock, whether such increase was attempted to be made at one or more times. Practically the same construction has since been placed upon article 576 by the Supreme Court in the case of Kampmann v. Tarver, 87 Texas, 497, in which it is held that the object of the article was to place limitations upon the increase of the capital stock of corporations organized under the general law, both as to the amount of the increase and as to the manner in which such increase should be effected, and that any amend-

ment in reference to the amount of capital stock of a corporation should be subordinated to the limitations contained in the article. We must hold, therefore, that the amount of bonds contracted for exceeded appellee's authorized capital stock, and the opinion of the attorney of Harris & Co., that the issue of the bonds was unauthorized and invalid, was correct. It follows, therefore, that if appellant was ignorant of the invalidity of the bonds at the time he effected the contract of sale, and the sale was not consummated because of their invalidity, he would be entitled to recover.

In its charge, the court instructed the jury as follows: "You are instructed that an agent employed to sell bonds, and he is ignorant of the legal status of said bonds, has a right to presume that the bonds so offered for sale are valid bonds, and to proceed with/his negotiations with expected purchasers upon that assumption, and if he find a purchaser who is able, ready, and willing to buy said bonds at a price and on terms entirely satisfactory to the owner of such bonds, and said sale is not consummated, through no fault of the agent or proposed purchaser, but because of the invalidity of the bonds so offered for sale, then the agent procuring such proposed purchaser is entitled to his commissions precisely as if the sale had been fully carried out." The principles of law thus enunciated are, in our opinion, correct in their application to this case; but the court further instructed the jury that, "Should you find, however, from the testimony that plaintiff and defendant entered into an agreement for the sale of said bonds by the terms of which plaintiff was to be paid a commission only in case the sale of said bonds was effected and the money realized therefrom by defendant, you will find for defendant, notwithstanding the invalidity of said bonds was the sole cause of the failure to consummate said sale." This portion of the charge is clearly repugnant to that part preceding which we have quoted, and precluded the appellant from a recovery. As is before stated, the appellant had a right to rely upon the bonds he was authorized to sell being valid, and if he was ignorant of their invalidity and performed his contract under the assumption that they were authorized, and the parties to whom he negotiated the sale refused to take them because they were invalid, and would otherwise have then purchased them, he would be entitled to his compensation although the sale was never consummated. Conklin v. Krakauer, 70 Texas, 739; Graves v. Bains, 78 Texas, 92; Bowser v. Field, 17 S. W. Rep., 45; Hoefling v. Hambleton, 19 S. W. Rep., 689; Moody v. Thornton, 24 S. W. Rep., 331; Byrd v. Frost, 29 S. W. Rep., 46; Orynski v. Menger, 39 S. W. Rep., 388; 1 Warv. on Vend., sec. 26, p. 237; Mech. on Agency, sec. 966, p. 794.

From this it follows that the trial court erred in giving that portion of the charge last quoted.

It was error to give the following special charge asked by appellee's counsel: "Even though the defendant was unable to issue and deliver the bonds contracted, at the time of the contract, by reason of the fact that said bonds would at that time have been illegal; yet if when such

want of power and illegality were called to the attention of defendant, and objection made to taking them on that account, defendant with the knowledge and consent of plaintiff and of the proposed purchasers, took steps to and did procure said defect to be cured within a reasonable time, and that after said defect was cured, and the right to issue said bonds secured, the proposed purchaser still refused to carry out said contract and take the bonds and pay for same, the plaintiff can not recover, and you will find for defendant."

The question upon which appellant's right depended was whether appellee could, within the time the bonds were contracted to be delivered, have legally issued them? If it could not, the fact that it took steps to place itself in a position to issue valid bonds, with the knowledge and consent of appellant and the proposed purchasers, would not constitute a waiver of his rights which accrued from the performance of his contract with appellee. His rights were fixed when he negotiated the contract to sell valid bonds of appellee, and Harris & Co. refused to take them on account of their invalidity, and no subsequent action taken by appelle after the time the contract should have been performed could deprive him of the right so acquired, notwithstanding he may have known of and consented to such action; nor were Harris & Co. under any obligation to take bonds, though valid, after the time expired in which appellee, under the contract, was to deliver them. Upon this point the following portion of special charge number 4, asked by appellant's counsel, is expressive of our view of the law: "You are instructed that time is the essence of the memorandum of agreement between defendant company and Harris & Co., dated September 2, 1892, and accepted with modifications by defendant company through its legal board of directors September 22, 1892, and that said contract provided for the sale and delivery by defendant company to said Harris & Co. of legal bonds of defendant company; that owing to a want of power in its charter, defendant company was unable to deliver to said Harris & Co. $450,000 of its legal first mortgage bonds stipulated for in said agreement, and that said Harris & Co. were not bound to receive or accept under said agreement other than legal bonds of defendant company, and were not bound to receive under said agreement any bonds of defendant company after the time fixed in said agreement for the delivery of such bonds." Such other errors as are assigned by appellant will probably not arise on another trial of this cause, and we deem it unnecessary to discuss them.

For the reasons of the errors indicated, the judgment of the District Court is reversed and the cause remanded.

*Reversed and remanded.*

ON REHEARING.

JAMES, CHIEF JUSTICE.—We are of opinion, upon a reconsideration of the case upon the motion for rehearing, that the case has been cor-

rectly disposed of. There is no uncertainty in the writing which defined appellant's right to commissions. He was to receive a compensation for making a sale of the bonds, to be paid out of the proceeds of the sale, as the proceeds were received. Appellee's contention is substantially this: That it was a condition to the payment of his compensation that the sale should be consummated and proceeds of sale received; and that if for any cause not the willful or fraudulent act of the appellee the sale was not effected, or the purchase money not paid, appellant was not to be compensated. That the contract might have been worded to have this effect can not be doubted. Pryor v. Jolly, 40 S. W. Rep., 959; Flower v. Davidson, 46 N. W. Rep., 308; Peete v. Sherwood, 45 N. W. Rep., 85. Had the sale been made on deferred payments, the payments would clearly have been a condition to defendant's liability to pay appellant under this writing.

The cases cited by appellee (Pryor v. Jolly, 40 Southwestern Reporter, 959; Toombs v. Alexander, 101 Massachusetts, 255; Walker v. Tirrell, 101 Massachusetts, 257) are not authority for its position. In Hinds v. Henry, 36 New Jersey Law, 328, also cited, the cloud on the title which broke off the contract to sell was known to the agent when he received his power of attorney, and the opinion in that case states that the evidence showed that the defendant made no fraudulent concealment of the defect in his title, and that the plaintiff acted with the full knowledge that his efforts might prove abortive by the defendant's inability to convey as was stipulated. It is well settled that when a broker, at the time he contracts or at the time he performs the work for which he asks compensation, knows of the matter which ultimately defeats his efforts, he is not entitled to recover. But when he does not know, the rule is that he has the right to assume and his principal impliedly warrants that the title to the property he deals with is free from infirmity. Gauthier v. West, 47 N. W. Rep., 656; Birmingham Co. v. Thompson, 5 So. Rep., 473; Sweeney v. Oil Co., 18 Atl. Rep., 612; Phelps v. Prusch, 23 Pac. Rep., 1111; Peete v. Sherwood, supra.

In the case of Gauthier v. West, it is stated that if the broker agrees to wait for his commission until the sale is fully completed, there is an implied contract that the defendant had the ability and would confer upon the purchaser a perfect title to the property. We think this is sound. And we are unable to see any difference between cases where the owner agrees to pay the agent generally, and where there is a stipulation that he is to receive his pay when the sale is completed, or out of the proceeds when they are received. In the latter case it is true the agent would have to await the completion of the sale, or the receipt of the proceeds after the sale. So far his compensation would be conditional. In cases where he is to be paid upon the completion of the sale, the authorities are that the broker is nevertheless entitled to compensation, if the sale was not completed because of the owner's inability to give a good title. This being the case, how can it be said that a stipulation that he was to await the payment of the purchase money, or be paid out of the

purchase money when received, relieves the owner from the implied warranty that he has a good title, when this sale is defeated and thereby the fund out of which the agent was to be paid is defeated, for such reasons? If the agent can recover in the one case, he should in the other.

As a matter of course, an agreement might be made whereby the broker will not be entitled to compensation if the sale is defeated by reason of the title or for any other reason. There is nothing in the contract that can be so construed. It is plain and unambiguous. It was agreed that he should have for his services in selling appellant's bonds the excess over a fixed sum net, to be paid in cash as the same should be received from the purchasers. In other words, if he sold the bonds for a surplus over the fixed sum, he was to be paid this surplus, but as to deferred payments, having to await their payment, to this extent only his pay was conditional. There was no condition that if the sale failed for any reason he was to receive no commissions. If such had been his agreement, it may be that it would have done away with all implied warranty, as was held in Flower v. Davidson, supra.

It may be proper to state in this connection that in a later case in Minnesota, Cromer v. Miller, 57 Northwestern Reporter, 318, the doctrine announced in Flower v. Davidson was, it seems, applied to a case where the agent's commission depended upon the payment of the purchase money, and the court held in that case, citing Flower v. Davidson, in effect, that such a stipulation did away with the implied warranty concerning the title. There is no reference to Gauthier v. West, which seemed to hold the contrary, a case decided by the same court. We are of opinion that it requires more than the agreement shows in the present case to be construed to exclude such warranty.

The charge copied in the opinion and there stated to be correct was in accord with the views above expressed, and the portion in conflict with these views also set forth in the opinion, should not have been added.

It is also claimed by appellee that plaintiff can not recover because the contract he procured to be made by the purchaser provided the title to appellee's properties and the legality of the issue of bonds should be satisfactory to the purchaser's attorneys, and this was a recognition that such adverse contingency might arise and was a sole condition made in view of possible defects liable to defeat it. If there is anything in the rule that the broker has a right, in negotiating a sale, to assume that his principal has a good and marketable title to the property given him to sell, then there is nothing in the above contention. He may proceed with a sale, and if he is authorized to contract, he may enter into a contract, upon the theory that the property is in that condition. He can not have a right to rely on this and lose it merely by relying on it.

We may add, in view of what is said in the motion, that the form in which Berg's commission was stipulated did not place him in any other attitude than that of a broker. He was to get all above a fixed sum as commission so stated, and the fact that this might be great or might be small does not effect a different relation.

As already stated, if the facts or circumstances show that appellant had notice of the condition of the bonds at the time he did the work, he could not recover. Or if the defect in the issue was due to him, then he can not recover. Nor can he recover if, as a matter of fact, the purchasers would not have completed the purchase had the bonds been without defect.

The other subjects referred to in the motion have been, we believe, correctly decided and sufficiently explained.

The motion is overruled.

*Overruled.*