𝕽𝖎𝖈𝖍𝖒𝖔𝖓𝖉

R. P. FOLTZ v. CONRAD REALTY COMPANY.

November 21, 1921.

1.  MOTION FOR JUDGMENT—*Pleading—Sufficiency of Notice.*—A procedure by motion for judgment is destitute of formalities. All that is required in the notice is to give the opposing party a sufficient idea of the grounds of action relied on, and to state a good cause of action. Great informality is allowed, but the notice must state a case, and must have the requisite certainty.

2.  NOTICE OF MOTION FOR JUDGMENT—*Pleading—Setting Out Contract.*—It is not necessary to set out in a notice of motion for judgment, *in haec verba,* the instrument relied upon, but only so much of the same as is essential to plaintiff's case may be set out according to its legal effect.

3.  NOTICE OF MOTION FOR JUDGMENT—*Sufficiency of Motion—Performance of Contract.*—Objection that a notice of motion for judgment was insufficent in that it showed on its face that plaintiff did not perform the contract alleged was not well taken. Recovery is not dependent in all cases upon a complete performance of a contract. The defendant's misconduct may render a complete performance impossible. In such a case the party not in fault is entitled to recover damages. This will be a recovery growing out of the contract.

4.  NOTICE OF MOTION FOR JUDGMENT—*Compensation of Real Estate Brokers—Sufficiency of Motion—Bill of Particulars—Case at Bar.*—A notice of motion for judgment afforded the following details: (1) That the plaintiff claimed a specific sum of money; (2) that it was due as compensation for selling certain lots for the defendant; (3) that the work was done under, and pursuant to, a designated contract between the parties, giving the legal effect of that portion of the contract relating to compensation for sales made by the plaintiff.

    *Held:* That if more details were required, a bill of particulars should have been demanded.

5.  REAL ESTATE BROKERS—*Contract—Conflict.*—In an action by a broker for compensation, defendant insisted that two clauses of the contract were conflicting. But the court held that there

was no ambiguity or conflict between the sections; that one section contemplated a complete execution of the contract, by a sale of all the lots, whereas the other section provided for compensation where part only of the lot was sold.

6. CONTRACTS—*Construction—Questions of Law and Fact—Looking at Whole Instrument.*—It is the function of the court to construe a written contract, looking to the entire instrument in the discharge of that function.

7. REAL ESTATE BROKERS—*Commissions—Refusal of Landowner to Comply with Contract—Case at Bar.*—A contract between a landowner and a broker for the sale of certain lots placed an agreed price on the lots aggregating $5,000, and provided that the broker should receive as compensation any excess over the agreed prices.

   *Held:* That where the landowner, without fault of the broker, after about one-third of the lots had been sold, refused to carry out the contract, the broker was entitled to such a sum as would equal the aggregate of the excess realized on the sales, over and above the prices placed on the lots.

8. PAROL EVIDENCE—*General Rule—Conversation Between the Parties to a Contract.*—Where subsequent to an alleged conversation between the parties, the parties entered into a valid written agreement, the whole sense of the parties is presumed to be contained in the agreement, and parol evidence as to such prior conversation is not admitted to vary or contradict the contract.

9. REAL ESTATE BROKERS—*Commissions—Default of Principal.*—The general principle is that, if a broker performs his part of a contract empowering him to sell the lands of his principal, and does all that he is required to do, and the sale is not consummated by reason of the default of the principal, the broker is entitled to his commissions, as the principal cannot wrongfully interfere with the broker and escape liability.

10. REAL ESTATE BROKERS—*Commissions—Default of Principal—Defective Title.*—When a vendor undertakes to make a good title to prospective purchasers, and a broker in conformity with the contract proceeds to secure purchasers, and tender them, but the vendor, in consequence of supervening information as to his title, ascertains that the same is bad, and on that account declines to make conveyances, such action on his part will not defeat the broker's right to compensation, the latter being in nowise at fault.

11. REAL ESTATE BROKERS—*Commissions—Default of Principal—Broker's Knowledge of Defective Title.*—It is essential to the broker's right to commissions in case of default of his principal, owing to a defective title, that the broker himself is not in

32

fault, that he did not know of the defect at the time of finding a customer, though he is under no implied obligation to find out whether the owner actually had the title which he claimed.

12. REAL ESTATE BROKERS—*Commissions—Default of Principal— Broker's Knowledge of Defective Title—Case at Bar.*—In the instant case the broker, after undertaking sale of defendant's lots, consulted a reputable attorney as to the title, who advised him that the title was defective in some respects.

*Held:* That this was certainly sufficient to put the broker on inquiry, and that it was the broker's duty to communicate this knowledge to prospective purchasers, and that having failed to do so, the purchasers secured were not such purchasers as the law contemplates and the broker was not entitled to commissions. Of course the broker might have shown that notwithstanding the attorney's opinion the title was good.

Error to a judgment of the Circuit Court of Page county in a proceeding by motion for a judgment for damages. Judgment for plaintiff. Defendant assigns error.

*Reversed.*

The opinion states the case.

*Will A. Cook* and *H. V. Strayer,* for the laintiff in error.

*John H. Downing* and *Wm. F. Keyser,* for the defendant in error.

SAUNDERS, J., delivered the opinion of the court.

This is a controversy concerning commissions on a sale of land by the Conrad Realty Company for R. P. Foltz, a citizen of Page county, in this State. The sale is alleged to have been made pursuant to the authority of a written contract between the parties, whereby it was agreed that the realty company should offer for sale for the plaintiff in error (defendant below) a tract of about twelve acres,

situated in the suburbs of Stanley, a small village in above county. The contract provided that the realty company should put the property in first class condition at its own expense, thoroughly advertise the sale, and furnish an experienced auctioneering force, and a band of music on the day of sale. Other features of the contract will be referred to in the discussion of the questions in issue.

After subdividing the tract into building lots, sixty-five in number, and incurring in this respect, and for advertising and other preliminaries, considerable expense, the realty company advertised the lots for sale on November 1, 1919. Twenty-one lots were sold on that date. At that stage, and on account of the interruption caused by a heavy and protracted rain, it was agreed that the sale of the remaining lots should be postponed. The purchasers paid one-third of the purchase money for their respective lots, and executed bonds, or notes, as required for the deferred payments. An agreed price had been placed upon these lots before sale. After the sale of said lots, aggregating $3,-342.50, defendant was called upon to accept the amount of the agreed price of the lots sold. He refused to do this, and declined to give receipts, execute deeds, or to sanction a sale of the remaining lots, although the realty company advised him that they were ready to go ahead and complete the sales according to the terms of the contract. Being unable to make further sales, or effect a settlement of sales actually made, owing to the attitude of the defendant, the plaintiff (the realty company) filed a notice of motion in the Circuit Court of Page county against the defendant for $1,057.50, the same being the difference between the sales price of the lots sold ($3,342.50), and the contract price ($2,285.00), agreed on between the parties. The motion was demurred to, and the demurrer sustained in part, and overruled in part. An amended notice was then filed, which was also demurred to, but this demurrer was overruled.

Thereupon issue was joined, evidence taken, and under the instructions of the court the case was submitted to the jury, which returned a verdict for the full amount claimed. At the instance of the defendant a writ of error was awarded by one of the judges of this court. The plaintiff in error will be hereafter referred to as the defendant, and the defendant in error, as the plaintiff.

The defendant assigns several errors:

First: "The court erred in not sustaining the demurrers to the original, and the amended notice of motion, respectively."

Second: "The court erred in striking out the evidence of Cane, Foltz and Pool, relating to conversations between these witnesses, and the plaintiff in reference to the meaning of the contract of employment, both before and after its execution, and in giving plaintiff's instructions."

Third: "The court erred in striking out the evidence of R. F. Leedy, and the letter introduced as a part thereof."

Fourth: "The court erred in refusing defendant's instructions Nos. two, three, four, five and six."

Fifth: "The court erred in allowing Chas. Conrad to be recalled 'after all but one of the instructions were in, and permitting him to testify that the plaintiff was a duly licensed landbroker.' "

Sixth: "The court erred in overruling defendant's motion to set aside the verdict, and grant a new trial on the grounds that said verdict was contrary to the law and the evidence."

The grounds of demurrer assigned to the first notice of motion were that the notice (1) "Did not set forth the contract of employment." (2) That it did not aver facts showing a full performance of the plaintiff's duty, and a performance of all it undertook to do under the contract.

The grounds assigned to the second notice were the same as the foregoing, and the following additional ground.:

"The amended notice is not sufficient in law in this, that the said notice on its face, shows that the plaintiff did not perform the contract alleged."

[1, 2] The court sustained the first demurrer in so far as to require allegations of performance, but refused to require the plaintiff to set out the contract in full. The procedure in this case was by motion for judgment, a procedure destitute of formalities. All that is required in the notice is to give the opposing party a sufficient idea of the grounds of action relied on, and to state a good cause of action. Great informality is allowed, but the notice must state a case, and must have the requisite certainty. Burks' Pleading and Practice (2nd ed.), pp. 223-224.

It is not necessary to set out in a notice, *in haec verba,* the instrument relied upon, but so much of the same as is essential may be set out according to its legal effect. This principle is stated in *Buster* v. *Wallace,* 4 H. & M. (Va.), p. 82, as follows: "In declaring on a covenant, it is sufficient to set out the substance and legal effect only of such parts of the deed as are necessary to entitle the plaintiff to recover."

See also *Reynolds* v. *Hurst,* 18 W. Va., p. 654, and cases cited, and 9 Cyc. Contracts, p. 714.

[3, 4] In the instant case the notice sufficiently advised the defendant of the amount claimed, the nature of the claim and the ground on which it was made, and of the instrument under which the claim was asserted. While the notice does not set out the contract, it does set out according to its legal effect so much of the same as is required for a statement of the plaintiff's case. The objection that the notice was "insufficient in that it shows on its face that the plaintiff did not perform the contract alleged" is not well taken. Recovery is not dependent in all cases upon a complete performance of a contract. The defendant's misconduct may render a complete performance impossible. In such a case the party not in fault is entitled to recover damages. This

will be a recovery growing out of the contract. The notice afforded the following details: (1) That the plaintiff claimed a specific sum of money; (2) that it was due as compensation for selling certain lots for the defendant; (3) that the work was done under, and pursuant to a designated contract between the parties, giving the legal effect of that portion of the contract relating to compensation for sales made by the plaintiff. If more details were required, a bill of particulars should have been demanded. The demurrers were properly overruled.

[5] Defendant insists that clauses 4 and 5 of the contract are conflicting, rendering that portion of the instrument "ambiguous, or uncertain, and on that account the evidence of the defendant, and his witnesses, Cane and Pool, relating to conversations between these witnesses, and the plaintiff, before and after its execution," should have been admitted on the trial. These clauses are as follows:

"Fourth: The party of the first part does agree to pay to the party of the second part at the close of the sale all excess above $5,000.00, in cash of the gross receipts of the sale, as evidenced by contracts signed by the purchaser arising from the sale.

"Fifth: The party of the first part agrees to place a minimum price on each lot, or tract, so that the sum total will aggregate $5,000.00, and agrees to pay to party of the second part ————— per cent commissions in cash at the close of sale, and 100 per cent of excess over and above the price placed on any particular tract, or lot."

There is no conflict between sections four and five, and no ambiguity patent, or latent, nor do these sections "mutually destroy each other, and render the instrument void." Section four contemplates a complete execution of the contract, and a sale of all the lots. In that event the party of the first part is to receive the agreed price on the lots, that is $5,000.00, and the party of the second part is to

receive the excess over the agreed aggregate.  Should the aggregate sales price be equal to, or fall below the agreed price, the party of the second part would receive nothing. In that respect the contract was one of hazard, *quoad* the realty company.  Section five is not altogether clear with respect to the one hundred per cent of the excess over and above the price paid to the party of the second part.  Manifestly, however, it does not mean that in event the lots were completely sold the realty company should receive the excess, if any, over the agreed values of $5,000.00, and in addition the full amount of the excess of the sale price of each lot over the agreed valuation of same.  Conceivably the lots might bring over five thousand dollars, say for illustration seven thousand dollars.  This would give the realty company two thousand dollars as commissions. Some of the individual lots might bring more, others less, than the agreed valuation.  The aggregate excess of the lots selling above the agreed valuation might be, say $2,500.-00.  Masifestly, as stated *supra*, the realty company would not be entitled to this $2,500.00, in addition to the $2,000.00, of excess over the agreed aggregate valuation of five thousand dollars.  The explanation of the provision for the payment to the realty company of the excess over the price placed on any particular tract, will be found in the following extract from section seven of the contract:

Sec. seven:  "  *  *  *  In the event the party of the first part sells, or conveys any part of the lots hereinbefore mentioned before the expiration of the agreement, then the party of the first part agrees to pay to the party of the second part, the commission as set forth in this agreement."

Should the party of the first part exercise his right under section seven to sell a lot, or lots, before the expiration of the agreement, selling same for an amount exceeding the valuation price, the realty company would be entitled to the excess, since in such case the said company is to receive

"the commission as set forth in this agreement," and obviously this could not refer to anything but the provision for "100 per cent of the excess over and above the price placed on any particular tract, or lot," contained in section five.

[6] It is the function of the court to construe a written contract, looking to the entire instrument in the discharge of that function. In the case in judgment the trial court appears to have properly construed the instrument in question, when in view of the facts relating to the breach of the contract it instructed the jury that the amount of recovery to which the plaintiff was entitled, in the event they believed from the evidence that the plaintiff sold certain lots embraced in the contract, and the purchasers executed the bonds, and paid the cash payment required by the contract, was such a sum as would equal the aggregate of the excess realized on the sales, over and above the prices placed on the lots. The contract did not in express language provide the terms of compensation of the party of the second part in the event that a complete sale under the contract was made impossible of execution by the improper and illegal conduct of the party of the first part. But it would seem to follow from the contract, and particularly from the provisions of sections four and eight, when a sale of the lots was in progress, and the party of the second part was not at fault, and the lots already sold constituting about one-third of the lots listed, had brought one and all a price in excess of the agreed valuation (a considerable number of them as much as fifty per cent in excess of such valuation), and under such circumstances the sale was not completed by reason of the untenable attitude of defendant, that the proper amount to which the plaintiff would be entitled in an action for compensation would be the amount indicated by the instruction of the trial court. The valuation of the lots sold was $2,285.00, and of the ussold lots $2,715.00.

Section eight of the contract provides that should any lots remain at the close of the sale, the party of the first part should take them back at the price placed upon them. This section would apply both when some of the lots offered were not taken by the bidders, and in a case in which the failure to complete a sale was due to the party of the first part. Hence in the case in judgment, under the ruling of the court, the defendant would take back forty-four unsold lots, valued at $2,715.00, so that he would have these lots and if he allowed the sales made to stand, bonds and cash aggregating $3,342.50, subject to a deduction in favor of the plaintiff for the excess, amounting to $1,057.50. The trial court properly construed the contract in the respect complained of.

[8] The defendant claims that prior to the execution of the contract of employment with the realty company he had a conversation with Chas. Conrad, president of said company, in relation to the meaning of same. He sought at the trial to prove this conversation, and thereby establish said meaning by his own testimony, and that of the witnesses Cane and Pool: in other words, he sought to give a meaning to the contract other than that to be derived by legal construction. This was an impingement upon the rule forbidding the use of parol evidence to vary a written instrument. Subsequent to the alleged conversation, the parties entered into a valid written agreement. The well established principle is that where there is such an agreement, the whole sense of the parties is presumed to be contained in it, and parol evidence is not admitted to vary, or contradict same. There are some definite exceptions to this rule, but upon the facts presented in the instant case, this is not one of them. It is not considered that the court erred in excluding the testimony of Foltz, and others relating to the above conversation with Conrad.

[9] The plaintiff rests his claim to commissions in the instant case upon the ground that it had discharged its under-

takings under the contract, fulfilling the same in all respects and that the failure to complete the sale, and sell all of the lots, was due to the misconduct of the defendant.

Conceding that this was all of the case, it would undoubtedly be true that the default of the defendant would not defeat the plaintiff's right of recovery. The general principle is that if a broker performs his part of a contract empowering him to sell the lands of a principal, and does all that he is required to do, and the sale is not consummated by reason of the default of the principal, the broker is entitled to his commissions, as the principal cannot wrongfully interfere with the broker, and escape liability. See 43 L. R. A., note, p. 606.

When a broker has effected a bargain and sale by a contract which is mutually obligatory on the vendor and the vendee, he is entitled to his commission whether the vendor chooses to comply with, or enforce the contract, or not. *Love* v. *Miller*, 53 Ind., 294, 21 Am. Rep., 192.

"If the testimony adduced on behalf of the broker shows that he produced a purchaser acceptable to the owner, able and willing to purchase on the terms offered by the owner, and that the failure to consummate the sale was due entirely to the failure of the owner to enter into a binding contract with such purchaser, the broker will still be entitled to his commissions." *Woodall* v. *Foster*, 91 Tenn., 195-7, 18 S. W. 241; *Cheatham* v. *Yarbrough*, 90 Tenn. 77, 15 S. W. 1076.

To the same effect is the following: The refusal of a principal to accept a purchaser found by the broker, will not defeat the broker's right to commissions where such purchaser is ready, willing, and able to purchase on the principal's terms. *Wright* v. *Brown*, 68 Mo. App., 577-583; *Chipley* v. *Leathe*, 60 Mo. App., 20.

The effect of the foregoing rulings is that once a broker negotiates a sale which conforms to the agreement of the

parties, it rests with the vendor to complete the transaction and make the deed, and if he fails to do so, and the sale falls through by reason of the failure of the principal, the broker, being without default, is entitled to his commissions. The precedents are in full accord with reason in respect to the plaintiff's right of recovery upon the facts supposed *supra.*

[10] The defendant, however, insists that he did not arbitrarily refuse to carry out the contract between him and the realty company, but declined to do so in good faith, for the reason that he had discovered his title to be defective. Even that defense if supported by the facts was not sufficient to defeat the broker's right to his commissions, provided the latter had proceeded in good faith to secure purchasers who were willing and able to purchase the property, upon the terms of the contract. When a vendor undertakes to make a good title to prospective purchasers, and a broker in conformity with the contract proceeds to secure purchasers, and tender them, but the vendor, in consequence of supervening information as to his title, ascertains that the same is bad, and on that account declines to make conveyance, such action on his part will not defeat the broker's right to compensation, the latter being in nowise at fault.

When the title of the principal is defective, so that the sale cannot be carried out, the general doctrine is as follows: "If the broker has acted in good faith, performed his contract, and done all that he was bound to do, and the sale with the purchaser procured by the broker is not carried out, or falls through owing to the defective title of the principal (vendor), the broker will be entitled to his commissions in the absence of evidence showing that the *broker had knowledge of such defect.*" (Italics supplied.) See cases cited in Note 1, Vol. 43, L. R. A., p. 609.

When the broker has done all that he is bound to do under the contract, and secured purchasers, he is entitled to his

commissions, and his right to compensation does not depend upon the validity, or invalidity of the principal's title. The broker is not responsible for the condition of the principal's title, and it is no part of his duty, as a general proposition, to look to the same.

If the broker does not know of defects in the principal's title at the time he enters into the contract, or at the time he performs the work, he has the right to assume that the title to the property is free from infirmity, and in such case he is entitled to commissions. *Berg* v. *San Antonio Street R. Co.*, 17 Tex. Cir. App. 291, 42 S. W. 647, 43 S. W. 929; *Gibson* v. *Gray*, 17 Tex. Civ. App. 646, 43 S. W. 922; *Peet* v. *Sherwood*, 43 Minn. 447, 45 N. W. 859.

The agent by his agreement to negotiate a sale, assumes no obligation, or responsibility, in reference to the title, and his right to commissions is not dependent upon the contingency of the principal's title being good. *Gerhart* v. *Peck*, 42 Mo. App. p. 644, 651. *Davis* v. *Morgan*, 96 Ga. 519, 520, 23 S. E. 417.

Hence defendant's refusal to make general warranty deeds to the purchasers who complied with the terms of the sale conducted by the plaintiff, on the ground that he had discovered that his deed was a special warranty deed, and that "he could only give the kind of deed he had, *i. e.*, all the right and title the boom company had," was a failure on his part to carry out the written contract which provided for "a good warranty deed to all purchasers complying with the terms of the sale." Defendant's default in the above respect would not relieve him from liability to the plaintiff for commissions on account of sales made. To permit him to do so, would be to allow him to take advantage of his own wrong to the prejudice of another who was without fault.

So far we have found no contentions of the defendant sufficient to constitute a defense to the plaintiff's claim.

[11, 12] But there is another assignment of error, which presents a more serious question, to-wit: That the plaintiff was aware that the defendant's title was defective, or at least had information which would put him, or any intending purchaser, on inquiry, and with this information in his exclusive possession, had proceeded to conduct the sale, and receive bids.

On the trial of the case, the defendant put Col. R. F. Leedy, a lawyer of Luray, Page county, on the stand. This witness was allowed to testify as follows: "Am a practicing lawyer at Luray; Conrad, not less than six days, nor more than ten days, after the contract in question was entered into, asked me to advise him as to the title of the twelve acres of land mentioned in these proceedings; I advised him by letter, October 23rd, giving my opinion of title, that it was bad, and gave reasons. Conrad had asked me to be present at the sale, and as I was a candidate for nomination in the primaries at that time, make a speech, but I didn't attend the sale." The defendant asked the witness to produce, and read to the jury the letter, or report on the title of the twelve acre tract, of date October 23rd, referred to in his evidence. Said letter is as follows:

"October 23, 1921.

"C. C. Conrad,

"Harrisonburg, Va.

"Dear Charlie:

"I have looked into the R. P. Foltz land title, and find that his conveyance, while prescribing a boundary of some 14 acres and 125 poles, giving the metes and bounds, only attempts to convey certain lots within the same, viz., Blocks 29, 30 and 33 and lots 501, 502, 503, 508, 507, 509, and 510 in block 31, and lots 201 to 206, 207, 208, 209 in block 36 in section one, upon a certain may entitled 'plan of Stanley Page county, Va.' It will be seen, therefore,

that while Mr. Foltz holds the entire inclusive survey in possession, there are a number of lots within it to which he took no title. They are so interspersed through the survey, that there are bound to be many lots in a new layout as to which there would in some cases be part, and possibly in some cases all, without title in Mr. Foltz. It is easy to see, therefore, that I could not be present at such a sale, as my presence would be construed as some sort of sanction of the validity of the title. I am sorry that such is the case, as I should be very glad to serve you at any time.

"Sincerely yours,"

The court refused to permit this letter to be read. Later, on motion of the plaintiff, the court struck out Col. Leedy's evidence. To this action of the court, and also to its action refusing to allow the letter to be read, the defendant duly excepted.

The court refused to admit the letter of Col. Leedy, and ordered his testimony to be stricken out, doubtless upon the theory that neither his testimony, or report, established that the title of the defendant to the lots in question, was bad. The determination of that point was a question for the court. It might well be that, after all, the judgment of Col. Leedy in respect of Foltz's title was at fault, and upon a judicial determination such title would be ascertained to be valid. But this was not the precise question intended to be raised by the testimony of Col. Leedy, and the introduction of his letter. This evidence was designed to affect the plaintiff, and its right to commissions by showing that it had obtained information which, as a matter of propriety and good faith, it should have submitted to intending purchasers. It was not matter that necessarily established the invalidity of defendant's title, but it was matter that would give any intending purchaser pause. Indeed we may feel

assured that if this report had been divulged on the day of sale, there would have been no purchasers. In the judgment of a reputable attorney, the title of the defendant was so defective that "there were bound to be many lots in a new layout, as to which there would in some cases be part, and possibly in some cases all without title in Mr. Foltz." So impressed was the attorney with the invalidity of the title, that he was unwilling to be present at the sale, lest his presence would be construed as "some sort of sanction of the validity of the title."

The general rule stated *supra* that a broker is not deprived of his right to commissions by the supervening ascertainment of defects in a principal's title, does not apply when the broker has notice of the defective title. "If at the time a broker makes sale of property, he has knowledge of, or information of defects in the title, and by reason of those defects the sale cannot be made effective, he is not entitled to his commissions." See *Hoyt* v. *Shipherd,* 70 Ill. 309, 311. Once in the possession of such information, it is the broker's duty to submit same to an intending buyer, and before offering him as a purchaser, to ascertain if the latter would take a possibly defective title. If upon communication of such information, the purchaser would still be willing to buy, and take the title agreed to be given by the principal's contract, for instance a deed with general warranty, the broker would be entitled to his commissions from the principal, if the subsequent failure to make a deed is the fault of the latter. "Where the broker brings to the principal a customer who is ready, able and willing to purchase the land on the principal's terms, and no sale is effected, the broker is entitled to his commissions, provided the failure to make sale results from the fault of the principal." *Brackenridge* v. *Claridge,* 91 Tex. 527, 44 S. W. 819, 43 L. R. A. 600.

It is essential to the broker's right of commission in such cases, that he himself is not at fault, and that he does not know of the defect at the time of finding a customer, but he is under no implied obligation to find out whether the owner actually has the title which he claims.   9 C. J., p. 629.

When brokers undertake to sell land with knowledge of defects in title, or reason to believe that such defects exist, it is their duty to disclose the fact to the prospective purchaser.

"A broker is not entitled to a commission on the purchase price of land when the sale fails by reason of a defect in the title of which defect the broker had notice, or was charged with notice at the time he entered into the contract to sell the land." *Montgomery* v. *Amsler,* 57 Tex. Civ. App. 216, 122 S. W. 307.   See also *McKinnon* v. *Hope,* 118 Ga. 462, 45 S. E. 413.

In the case in judgment, the realty company undertook to investigate the state of the defendant's title.   In the course of this investigation it secured information which was certainly sufficient to put it on inquiry, and which it was as much its duty to make known to the bidders on the day of the sale, as it was the duty of the broker in the case *supra,* to communicate to a prospective purchaser the broker's knowledge of an outstanding lease.   Honesty and fair dealing required that the knowledge which the realty company had secured by its independent inquiry, and which certainly would have seriously affected the bidding, should have been promulgated for the benefit of prospective bidders.   The realty company claims that it is entitled to commissions on the ground that it has secured purchasers ready and willing to purchase the principal's lots on the principal's terms, as set out in the written agreement, and that any failure of consummation was the fault of the principal. But the broker has not secured such purchasers as the law contemplates.   The purchasers were entitled before bidding

to the knowledge that the broker possessed, whether that knowledge was of an actual defect of title, or information that would put a bidder on inquiry before proceeding further.

In the instant case, the court rejected the testimony relating to the broker's information touching the defendant's title, refused all the instructions prayed by the defendant, and gave a single instruction, practically directing the jury to find for the plaintiff. The court should have received the testimony of Col. Leedy, and his report on the title in question to his clients, the realty company, and if no further evidence was submitted in that connection, should have instructed the jury that if they believed from the evidence that the company possessed such knowledge relating to defendant's title as would have put a reasonably prudent man on inquiry, and had failed to communicate such knowledge to the bidders, it could not recover the commissions claimed. Of course it would have been competent for the plaintiff to submit further evidence on the above line, and undertaken to secure a ruling from the court that upon the whole the title which was the subject of the adverse report, was a good and valid one. Such a ruling from the court would have left the broker in a position to recover commissions in spite of its failure to communicate the information in its possession. For the error of the court in respect of rejecting the testimony of the defendant, submitted to show that the plaintiff, at the time of sale, had information of the state of defendant's title which it should have submitted to the bidders, and in giving a peremptory instruction to the jury to find for the plaintiff, this case must be reversed, and remanded for a further trial to be had by the plaintiff, if desired, upon the principles announced, and conclusions reached in this opinion. There are other assignments of error which have not been formally disposed of, but they are without merit.

*Reversed.*